IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and STATE OF TEXAS, *ex rel.* § § § | | |
| KATHERINE J. SIMMS, § Relator, § § | | |
| V. § | A-10-CV-914-AWA | |
| § AUSTIN RADIOLOGICAL ASSOC. § Defendant. § | | |

## ORDER

Before the Court is Defendant Austin Radiological Association's ("ARA") Motion for Clarification (Dkt. No. 98) and Relator Katherine J. Simms's ("Simms") Response (Dkt. No. 102). The following documents are also considered in relation to ARA's Motion for Clarification: Advisory to the Court regarding Relator's List of Issues Remaining (Dkt. No. 106) and an Exhibit List, submitted *in camera* (Dkt. No. 110). On May 24, 2013, the Court held a hearing on ARA's Motion for Clarification. Due to scheduling issues, the hearing was continued and concluded on May 31, 2013.

### I. BACKGROUND

The relevant background in this case was detailed in a previous order. *See* Dkt. No. 93. ARA's current pending motion concerning discovery is the fifth discovery-related motion in this case. *See* Dkt. Nos. 62, 65, 76 and 94. Despite previous encouragement to resolve their discovery disputes without the intervention of the Court, the parties have been unable to do so and still have the following unresolved discovery issues in relation to Simms's claims under the False Claims Act.

At this time, there do not appear to be any discovery issues related to Simms's retaliation and wrongful discharge claim.

## II. ANALYSIS

ARA's Motion for Clarification reflects the continued dispute between the two parties concerning discovery in this case. In its motion, ARA seeks clarification with regard to the following three issues:

1. "Whether ARA has complied with its discovery obligations by producing all Charge Codes within the reasonable time frame for discovery of 1/1/2007 to 9/22/2011 for those charge codes that have a class code of Medicare, Medicaid, or Champus/Tricare as a primary, secondary or tertiary payor and further including all of the payment data and adjustment data or other data for each of those Charge Codes."

2. "Whether ARA's discovery obligations have been fulfilled with respect to government payors."

3. "Whether it must produce non-responsive portions of documents or whether it may redact this information."

Dkt. No. 98 at 8. As a general matter, ARA believes that it has complied with the Court's March 18th order concerning discovery. On the other hand, Simms asserts that ARA has not complied fully with the Court's March 18th order and is continuing to delay production. Dkt. No. 102. Simms requests that the Court order ARA to (1) "produce all responsive financial documents existing between January 1, 2007 and September 22, 2011," (2) "produce unredacted versions of all documents existing between January 1, 2007 and September 22, 2011 on which redactions were made because they reference an earlier date," and (3) "produce unredacted versions of documents redacted for unresponsiveness or because related to entities not a party to the litigation." *Id.* at 4. The Court will address each issue in turn.

A. **Whether ARA has complied with its discovery obligations by producing all Charge Codes within the reasonable time frame for discovery of 1/1/2007 to 9/22/2011 for those charge codes that have a class code of Medicare, Medicaid, or Champus/Tricare as a primary, secondary or tertiary payor and further including all of the payment data and adjustment data or other data for each of those Charge Codes.**

This issue concerns ARA's production of its financial and accounting data with regard to accounts where Medicare, Medicaid or CHAMPUS/TRICARE are a primary, secondary or tertiary payor. ARA asserts that it is not required to produce all data generated during the time frame "if that data concerns adjustment codes or payment codes related to charges that occurred prior to January 1, 2007." Dkt. No. 98 at 5. ARA also believes that it is not required to produce "data generated after September 21, 2011 related to charges prior to September 22, 2011." *Id.* ARA argues that ordering it to produce such information subjects it to unending discovery. *Id.* On the other hand, Simms contends that ARA is required to produce "all data generated during the relevant time period regarding charges to government health care programs, regardless of the dates of service." Dkt. No. 102 at 2. Simms stresses that the Court emphasized that the important date is the date of retention of overpayments, not the date on which the service was provided. *Id.*

Before the Court outlines the particulars of ARA's discovery obligations, the Court finds it necessary to address the continuing dispute over using the date of service as the event by which to determine whether a particular account is relevant to Simms's claims. In a number of separate motions and proceedings, ARA has requested that the Court "clarify," or "reconsider," its rulings with regard to the reach of Simms's claims, and has continued to assert in pleadings and in arguments that the Court has misconstrued the False Claims Act ("FCA"), as amended by the Fraud Enforcement Recovery Act ("FERA"), and has misunderstood Judge Yeakel's order on ARA's Motion to Dismiss. *See, e.g.*, Dkt. No. 94. In essence, ARA contends either: (1) that Judge Yeakel

3

has dismissed all claims that related to retention of overpayments involving patients whose dates of service were prior to May 20, 2009 (the effective date of the FERA amendments); or (2) that regardless of what Judge Yeakel did or did not dismiss, Simms is precluded by the FCA, FERA, and case law—such as the decision in *United States ex rel. Stone v. OmniCare, Inc.*, No. 09–4319, 2011 WL 2669659 (N.D. Ill. July 7, 2011)—from pursuing any claim for retained overpayments stemming from patients whose dates of service predate the FERA amendments.

As the undersigned has expressed on several occasions, Judge Yeakel quite clearly declined to dismiss a portion of Simms's claims, specifically those claims related to overpayments retained after May 20, 2009. Nowhere in his order does Judge Yeakel tie this category of claims to patients whose "dates of service" fell into any particular time frame. Instead, and quite to the contrary, in concluding that Simms had validly stated reverse FCA claims, Judge Yeakel pointed to the fact that the complaint alleged that Simms had run reports in April 2010 showing significant credit balances for patients who received services in August 2008, May 2007, and March 2005. Dkt. No. 68 at 11–12. In fact, he pointed to the age of the account balances as evidence in support of his decision *not* to dismiss the claims:

> The fact that Simms was able to identify hundreds of overpayments that remained unpaid in the course of her investigation, some of which were associated with services many years prior to the date Simms ran the payment lists, constitutes reliable indicia leading to a strong inference that ARA deliberately ignored or recklessly disregarded the existence of government overpayments.

Dkt. No. 68 at 13. Judge Yeakel even went so far as to reject ARA's claim that liability for retaining overpayments did not attach until the Patient Protection and Affordable Care Act ("PPACA") imposed the 60-day limit on retaining overpayments, given "Congress's clear statement [in FERA] that retention of an overpayment by a government payor subjected providers to civil liability as of

May 20, 2009." *Id.* Judge Yeakel summarized his decision by dismissing "Simms's complaint with respect to its *wrongful retention of overpayments* predating May 20, 2009," not with respect to dates of service. *Id.* (emphasis added). In the end, there is simply no reasonable way to read Judge Yeakel's order on ARA's Motion to Dismiss as dismissing all of Simms's claims stemming from patients whose date of service was prior to May 20, 2009.

ARA has also argued previously that "as a matter of law, FERA does not apply retroactively to ARA's conduct prior to [May 20, 2009]." Dkt. No. 94 at 7. With regard to ARA's legal contention that ARA cannot be held liable for overpayments arising from dates of service prior to May 20, 2009, the Court has revisited the relevant statutes as well as case law and, after careful consideration, declines to adopt ARA's reasoning. The relevant statutory language, as amended by FERA, prohibits a person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). FERA further clarified the term "obligation" to mean "an established duty, whether or not fixed, arising from . . . the retention of any overpayment." 31 U.S.C. § 3729(b)(3). Put together, an entity is liable for (1) knowingly (2) making, using, or causing to be made or used (3) a false record or statement (4) that is material to an established duty, whether or not fixed, to pay or transmit money or property to the government (5) arising from the retention of any overpayment. An entity is also liable for (1) knowingly and (2) improperly avoiding or decreasing an established duty to pay or transmit money or property to the government (3) arising from the retention of any overpayment. There is no language anywhere in the statute suggesting, much less stating, that it applies only to patients with

5

"dates of service" in any particular time frame or that "dates of service" serve as the relevant event by which to measure whether liability may attach to a retained overpayment. Rather, the statute clearly states that an entity's "obligation . . . *aris[es] from* . . . the *retention of any overpayment*." 31 U.S.C. § 3729(b)(3) (emphasis added).

Furthermore, using the date of service as the relevant event by which to measure liability is illogical. Obviously, such a cause of action cannot be triggered until—at the earliest—a payment from the government is received, regardless of when the services were rendered. When an entity renders services to a patient, no false record or statement has been created. In addition, an entity cannot "knowingly and improperly avoid[] or decrease[] an obligation to pay or transmit money or property to the Government" until that entity has actually received a payment from the government. 31 U.S.C. § 3729(a)(1)(G). In short, there cannot be an overpayment until there is a payment. Consider, for example, if ARA provided a Medicare patient services on May 1, 2009, billed those services on May 15, 2009, and received a payment from the government for those services, which exceeded what ARA was entitled to, on June 30, 2009. By ARA's argument, that claim is precluded, because applying the FERA amendments to services rendered on May 1, 2009, would be inappropriately retroactive, given FERA's May 20, 2009, effective date. But plainly ARA's obligation to refund the overpayment in this example did not exist before it received the overpayment on June 30, 2009. Therefore, the correct event by which to measure when an obligation to refund monies to the government arises cannot be the date of service. Instead, the Court finds the relevant event to be the date on which ARA receives payment from the government payor, regardless of when services were rendered.

Having established the date of payment, rather than the date of service, as the relevant event for determining when an obligation to refund an overpayment arises, the Court must now assess how the provisions of FERA apply to the instant case. Here, the law provides less clarity. As noted above, the earliest date on which ARA could be held liable for its obligation arising from the retention of overpayments is the date on which ARA received payment from the government. What is less obvious, however, is whether ARA may be held liable for all overpayments it retained as of May 20, 2009, regardless of when it received payment from the government, or whether it can only be held liable for overpayments resulting from payments received on or after May 20, 2009. This issue further involves the important question of whether holding ARA liable for all overpayments it retained as of May 20, 2009, regardless of date of payment, would be an improper retroactive application of FERA.

On this point, the Court declines to reach a conclusion at this stage in the proceedings. The current motion before the Court is a motion for clarification on discovery, not liability. Information sought in discovery "need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1). Furthermore, the Court is mindful that discovery must continue in this case and will not delay discovery pending the question regarding the scope of ARA's liability. *See* FED. R. CIV. P. 1 ("[The rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). Given the parties' continuing arguments over discovery and the delay that has already taken place in this case, the Court finds that the most efficient manner in which to continue discovery is for ARA to produce financial data in accordance with the broader scope of liability as outlined above—that ARA is liable for all overpayments it retained as of May 20, 2009, regardless

of when it received payment from the government. Therefore, regardless of the Court's conclusion concerning ARA's scope of liability prior to trial, Simms will have obtained sufficient discovery to proceed without imposing further delay in this case.

Under the broader scope of liability, ARA would be liable for all overpayments it retained as of May 20, 2009, regardless of the date of payment on the account. The simplest method of obtaining such information would be for ARA to produce a report, dated May 20, 2009, indicating all accounts involving government payors that showed a credit balance. Unfortunately, ARA has represented that such a report does not exist and cannot be generated. Thus, the Court must fashion discovery in a manner that captures this information.

As such, ARA is hereby **ORDERED**, to the extent it has not done so, to produce all *financial or accounting* data associated with patient accounts in which Medicare, Medicaid or CHAMPUS/TRICARE are a primary, secondary or tertiary payor where a *date of payment* was made between November 29, 2004, and September 22, 2011, inclusive.[1] This discovery encompasses the broadest potential scope of liability for ARA under the FCA's six-year statute of limitations and will capture all overpayments for which ARA could be held liable. 31 U.S.C. § 3731(b)(1). ARA is further **ORDERED** to produce all credit balance reports in existence from May 20, 2009, through the present, to be supplemented on the 1st and 15th of each month from the date of this order until trial or the resolution of this suit. From these credit balance reports, Simms is permitted to seek additional directed discovery should there be a patient account involving a government payor on

---

[1] The Court wishes to be clear that the time period of November 29, 2004, through September 22, 2011, only applies to financial or accounting data. Other documents, such as email communications or meeting minutes, are still subject to the Court's previous January 1, 2007, through September 22, 2011, time frame.

which a credit balance continues to exist after sixty days.  The Court emphasizes that its order is a ruling on discovery only and should not be construed as a ruling on ARA's scope of liability.  As noted above, the Court declines to issue a determination on liability at this stage.

**B.    Whether ARA's discovery obligations have been fulfilled with respect to government payors.**

This dispute involves the production of financial data for patient accounts in which government programs other than Medicare, Medicaid or CHAMPUS/TRICARE are a primary, secondary or tertiary payor**.**  ARA states that it is not withholding these accounts, but that it is simply unable to produce accounts in which government programs other than Medicare, Medicaid or CHAMPUS/TRICARE are a payor.  Dkt. No. 98 at 6.  ARA explains that because there are so few patients with these payors, separate class codes or insurance codes for these other government programs do not exist in ARA's system.  *Id.*  At the hearing, ARA estimated that accounts involving a government payor other than Medicare, Medicaid or CHAMPUS/ TRICARE constituted probably less than one-tenth of a percent of all ARA accounts.  Dkt. No. 109 at 49.  Simms did not respond to this portion of ARA's motion in her filings, but did express disbelief on this point at the hearing.  Simms argues that the evidence produced thus far is inconsistent with ARA's assertion that it cannot track accounts where government programs other than Medicare, Medicaid or CHAMPUS/TRICARE are payors.  Simms notes that even ARA's own policy defines government programs to include programs other than Medicare, Medicaid and CHAMPUS/TRICARE, making it difficult to believe that ARA cannot track payments from these other government programs.  *Id.* at 22–23.

After considering the parties' arguments, the Court finds that ARA has complied with the Court's March 18th discovery order with regard to government payors other than Medicare, Medicaid or CHAMPUS/TRICARE. First, it is unclear to the Court just how many accounts would be involved. At the hearing, neither Simms nor ARA were able to provide an estimate of the universe of accounts at issue with specificity. ARA represented that accounts involving other government payors probably constituted about one-tenth of one percent of all accounts. The Court has seen nothing to suggest that the number of accounts with government payors other than Medicare, Medicaid or CHAMPUS/TRICARE involve a substantial number. Furthermore, the Court finds unpersuasive Simms's allegation that ARA's own policy and its inability to identify accounts involving government payors other than Medicare, Medicaid or CHAMPUS/TRICARE are inconsistent. As the undersigned noted at the hearing, whether ARA has assigned separate billing codes to government programs other than Medicare, Medicaid or CHAMPUS/TRICARE is a separate issue from whether ARA repays overpayments from these other government programs. Put simply, ARA may have decided that it simply did not have enough accounts involving other government payors to warrant the assignment of a separate billing code.

Therefore, the Court concludes that ARA has complied with its discovery obligation as it pertains to accounts involving government programs other than Medicare, Medicaid or CHAMPUS/TRICARE. Ordering ARA to produce all accounts with other government payors when ARA is unable to identify those accounts electronically would not be an efficient method of conducting discovery. However, Simms is certainly permitted to inquire about these accounts through other discovery mechanisms, such as depositions. Should Simms, in the course of

discovery, uncover information that suggests these accounts constitute a significant number or that they are identifiable by ARA, the Court will entertain her arguments at that time.

C. **Whether ARA must produce non-responsive portions of documents or whether it may redact this information.**

This issue concerns ARA's redactions of documents which it produced as part of its discovery obligation to Simms. ARA asserts that it redacted (1) information not related to government payors; (2) information outside the scope of the reasonable time frame for discovery determined by the Court; and (3) information related to entities not a party to this litigation. Dkt. No. 98 at 7. ARA argues that a logical extension of the Court's March 18th order permits it to redact "non-responsive or irrelevant financial data outside of the reasonable time frame or information about entities that are not parties to this litigation."[2] *Id.* at 8. Simms argues that the redactions performed by ARA are so extensive that she is unable to determine whether the redactions are appropriate. Dkt. No. 102 at 2. In particular, Simms takes issue with the latter two categories of redactions, contending that ARA should not be allowed to redact information on a document simply because it refers to a date prior to January 1, 2007, or because it refers to an entity that is not a party to this suit. *Id.* at 2–3. Simms does not contest ARA's redaction related to records that do not involve government payors. *Id.* at 3.

At the hearing, both parties produced examples of the redactions in dispute, which range from redactions of single words or phrases to redactions of entire pages. ARA also produced

---

[2] ARA cites the following language from the Court's March 18th order: "ARA may choose either to review its financial records and remove those records without government payors itself or it can shift the burden of doing so to Simms." Dkt. No. 93 at 16.

unredacted versions of the example documents.[3]  Both parties agreed to have the example documents, both redacted and unredacted, entered as an exhibit for the purposes of the Court's *in camera* review of the documents.  Both parties further agreed that the example documents provided a representative sample of the types of issues at dispute regarding ARA's redactions.

After reviewing the example documents *in camera*, the Court concludes that ARA has improperly redacted information from its documents.  Although ARA is correct in stating that the Court allowed ARA to exclude accounts involving non-government payors, its attempt to extend the Court's statement to cover all information ARA deemed non-responsive or irrelevant was improper.  The Court's statement was simply meant to address ARA's previous concern that the production of its financial and accounting data and removal of those accounts involving non-governmental payors would be overly burdensome.  The Court made no statement on the redaction of documents.

Furthermore, the Court is unpersuaded by ARA's citations to district court decisions which have allowed the redaction of non-responsive information.  The scope of discovery and the relevance of certain information is naturally dependent on the specific facts and claims in each case.  Among ARA's example cases is *Louis Vuitton Malletier v. Tex. Int'l P'ship*, 2012 WL 5954673 (S.D. Tex. 2012), in which the court considered plaintiff's redaction of information plaintiff deemed to be irrelevant or otherwise protected by privilege.  Yet the court in *Louis Vuitton Malletier* never conducted a review *in camera* of a representative sample of the documents in dispute, choosing instead to rely on the plaintiff's description of those redactions in making its decision.  Such is not

---

[3] Specifically, the redacted and unredacted versions of the following documents were provided to the Court: Bates Numbers ARA004525–ARA004535, ARA005085, ARA005145–ARA005147, ARA005228–ARA005233, ARA005290, ARA005300, ARA005307, ARA005405, and ARA005408–ARA5413.

the case here, where both parties have agreed to the Court's *in camera* review of a representative sample of disputed documents. Having considered those documents, the Court does not believe ARA's redactions were proper.

ARA also cites three other district court cases in support of its contention: *Spano v. Boeing Co.*, 2008 WL 1774460, (S.D. Ill. 2008); *Schiller v. City of New York*, 2006 WL 3592547 (S.D.N.Y. 2006); and *Beauchem v. Rockford Products Corp.*, 2002 WL 1870050 (N.D. Ill. 2002). Other district courts, however, have declined to follow these decisions. *Beverage Distributors, Inc. v. Miller Brewing Co.*, 2010 WL 1727640 at *3–5 (S.D. Ohio 2010) (distinguishing *Spano*, *Schiller*, and *Beauchem* based on the number of redacted documents and the content of those redactions); *see also David v. Alphin*, 2010 WL 1404722 at *3 (W.D.N.C. 2010). As noted by the court in *Beverage Distributors*,

> [t]hese decisions are not necessarily irreconcilable. The themes which pervade each of them are (1) that redaction of otherwise discoverable documents is the exception rather than the rule; (2) that ordinarily, the fact that the producing party is not harmed by producing irrelevant information or by producing sensitive information which is subject to a protective order restricting its dissemination and use renders redaction both unnecessary and potentially disruptive to the orderly resolution of the case; and (3) that the Court should not be burdened with an in camera inspection of redacted documents merely to confirm the relevance or irrelevance of redacted information, but only when necessary to protect privileged material whose production might waive the privilege.

2010 WL 1727640 at *4. "Redaction is, after all, an alteration of potential evidence" and "a party should not take it upon him, her or itself to decide unilaterally what context is necessary for the non-redacted part disclosed, and what might be useless to the case." *Evon v. Law Offices of Sidney Mickell*, No. S–09–0760, 2010 WL 455476, at *2 n.1 (E.D. Cal. 2010). Furthermore, "[i]t is a rare document that contains only relevant information." *Bartholomew v. Avalon Capital Group, Inc.*, 278

F.R.D. 441, 451 (D. Minn. 2011). Oftentimes, "irrelevant information within a document that contains relevant information may be highly useful to providing context for the relevant information." *Id.*; *see also In re State Street Bank & Trust Co. Fixed Income Funds Inv. Litig.*, Nos. 08–1945, 08–333, 2009 WL 1026013, at *1 (S.D.N.Y. 2009) ("[Unilateral] redactions are generally unwise. They breed suspicions, and they may deprive the reader of context."); *In re FedEx Ground Package Sys., Inc. Emp't Practices Litig.*, No. 3:05–MD–527, 2007 WL 79312, at *5 (N.D. Ind. 2007) ("Generally, the Federal Rules provide no procedural device for unilateral redaction by a party and it is a procedure that is not favored.").

In light of the foregoing discussion, the Court is unconvinced that ARA may unilaterally redact information it believes is irrelevant or non-responsive. With regard to information redacted as being outside the reasonable time frame, the Court finds ARA's redactions to be improper. In its March 18th order, the Court set a reasonable period for discovery from January 1, 2007, until September 22, 2011. Dkt. No. 93 at 12. On this point, ARA does not assert that Simms was seeking documents created outside this time frame; rather, it simply removed any references to dates outside this time frame. Such redactions misapply the Court's March 18th order. Moreover, as to ARA's redaction of information related to entities not a party to this litigation, the Court also finds ARA's reasoning behind those redactions to be weak. By ARA's logic, it could redact any reference to any entity that is not a party to this litigation. Indeed, ARA's own representation is that it redacted "information related to *entities* not a party to this litigation." Dkt. No. 98 at 7 (emphasis added). Yet, having reviewed *in camera* the example documents — documents which ARA agrees to be a representative sample of the disputes at issue — the Court finds that ARA's redaction categories appear to be targeted rather than broadly applied. For example, the documents show that there are

references to at least one entity not a party to this litigation and to dates before January 1, 2007, which were not redacted by ARA. *See* Bates Nos. ARA005228–ARA005229. Furthermore, the documents also show that ARA selected to redact parts of emails as "unrelated to refunds or overpayments," but chose to leave other portions of those same emails, which are also clearly not related to refunds or overpayments, unredacted. *See* Bates No. ARA005805. Such selectively applied unilateral redactions are precisely the type of redactions that not only raise the suspicions of Simms, but also of this Court.

In this instance, the Court concludes that the best solution is for ARA to produce unredacted versions of its documents, subject only to redactions for privilege and for information related to non-government payors in its financial and accounting materials *only*. *See* FED. R. CIV. P. 1 ("[The rules] should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). ARA may not redact information related to non-government payors in documents other than its financial and accounting materials.[4] Any concerns regarding confidentiality are sufficiently addressed by the protective order in this suit. Dkt. No. 32. Accordingly, ARA is hereby **ORDERED** to reproduce its documents by July 26, 2013. ARA is further **ORDERED** to provide Simms with a redaction log to specify which documents, following the entry of this order, were redacted for privilege or because the financial and accounting data contained information related to non-governmental payors.

---

[4] For example, ARA may not redact information related to non-governmental payors contained in an email or meeting minutes.

### III.  SCHEDULING ISSUES

Finally, the Court addresses Simms's scheduling concerns. At the hearing, Simms expressed frustration at the continued delay in obtaining meaningful discovery from ARA. Consequently, Simms noted that she would be unable to designate her testifying experts by the current deadline of July 1, 2013. Upon the Court's inquiry as to an acceptable amended schedule for the designation of experts, Simms represented that the answer would depend on several factors, including when Simms would be able to obtain all the data she needs, a complete explanation of the codes and fields used by ARA, and the amount of time Simms's current expert, Ms. Hoane, would require to analyze the data.

The Court acknowledges that Simms's scheduling concerns derive, in part, from the Court's delay in issuing its previous order on discovery. Accordingly, the Court hereby **VACATES** the deadlines set forth in the Amended Scheduling Order (Dkt. No. 82). The Court further **ORDERS** both parties to meet and confer regarding a new set of deadlines. The parties shall submit to the Court, by July 12, 2013, a set of proposed amended deadlines, jointly agreed to by both parties, with a trial date no later than June 2014.

### IV.  CONCLUSION

In accordance with the preceding discussion, the Court hereby **GRANTS** Defendant Austin Radiological Association's Motion for Clarification (Dkt. No. 98) as set forth above.

The Court further **ORDERS** ARA to serve the additional production ordered no later than July 26, 2013.

Finally, the Court hereby **VACATES** the deadlines set forth in the Amended Scheduling Order (Dkt. No. 82) and **ORDERS** the parties to submit to the Court, by July 12, 2013, a set of

proposed amended deadlines, jointly agreed to by both parties, with a trial date no later than June 2014.

    SIGNED this 27th day of June, 2013.

                                               ANDREW W. AUSTIN
                                               UNITED STATES MAGISTRATE JUDGE